[No. 59359-1. En Banc. February 24, 1994.]

THE CITY OF SEATTLE, *Respondent*, v. JAMES P.
MCCREADY, ET AL, *Appellants*, SEATTLE MUNICIPAL
COURT, ET AL, *Respondents*.

*Richard B. Sanders* and *Eric R. Stahlfeld,* for appellants.

*Mark H. Sidran, City Attorney,* and *Miriam M. Reed* and *Phillip E. Brenneman, Assistants,* for respondent.

*Thomas B. Nast* on behalf of Washington Apartment Association, amicus curiae for appellants.

*Kenneth R. Davis II* on behalf of American Civil Liberties Union of Washington, amicus curiae for appellants.

*Scott Mannakee* on behalf of Tenants Union, amicus curiae for respondent.

*Frederick Gentry* on behalf of Washington State Fire Chiefs Association, amicus curiae for respondent.

UTTER, J. — In this case, we once again consider the constitutionality of portions of the City of Seattle's Residential Housing Inspection Program (RHIP). In *Margola Assocs. v. Seattle,* 121 Wn.2d 625, 854 P.2d 23 (1993), we were confronted with a number of constitutional challenges to the funding provisions of the RHIP. We rejected most of these challenges, including those based on taking without just compensation, substantive due process, equal protection, and the impairment of contracts. *Margola,* 121 Wn.2d at 642-54. We remanded the case for further proceedings, however, because a material question of fact persisted as to whether the funding provisions were an impermissible tax or a permissible fee. *Margola,* 121 Wn.2d at 640-41.

Here, we are faced with a constitutional challenge to the manner in which Seattle has *implemented* the RHIP. A number of Seattle landowners assert that "inspection warrants" issued by a superior court in implementation of the RHIP violate the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. They argue the warrants are unconstitutional because they were issued without probable cause to believe the buildings to be searched were in violation of the pertinent building and housing codes.

We hold that under Const. art. 1, § 7, the warrants must be quashed.

## I

As we noted in *Margola*, Seattle previously enforced its building and housing codes, including the Building Code, the Electrical Code, the Housing Code, etc. (collectively, "the housing codes"), solely on a complaint and probable cause basis. 121 Wn.2d at 631-32. That is, the City's Department of Construction and Land Use (DCLU) would investigate potential violations of the housing codes only when there was either a complaint of a violation or if DCLU had other evidence constituting probable cause to believe a violation had occurred.

In 1986, DCLU concluded the complaint-based system was inadequate and that some form of "proactive" enforcement program was needed. The agency therefore proposed to the Seattle City Council that research be done in the direction of formulating such a program. In 1987, the Seattle city council accepted DCLU's recommendation, determining that "housing code enforcement on a complaint basis frequently delays City intervention until structures have become seriously deteriorated." Seattle City Ordinance 113531 (July 30, 1987). The city council therefore directed DCLU to develop and implement a "demonstration program" involving proactive enforcement, in which inspections would be based on objective factors such as building size, age, and geographic location rather than on probable cause. Ordinance 113531, § 1.

The demonstration program operated from 1987 through the end of 1988. Three hundred fifty apartment buildings were chosen at random from the City's housing stock and inspected for housing violations. DCLU then compiled the data from the inspections. DCLU reported to the city council that while 78 percent of the 350 buildings inspected had some sort of housing code violation, only a "small percentage" had "serious" code violations. Clerk's Papers, at 197. However, DCLU also reported that over 80 percent of the buildings with violations had not been the subject of complaints under the previous system. Clerk's Papers, at 197. In light of the findings of the demonstration program, DCLU

recommended to the city council some sort of permanent proactive enforcement program be adopted.

The city council therefore directed the agency by resolution to "design and propose a proactive enforcement program". Seattle City Resolution 28046 (Sept. 18, 1989). The council indicated that any proposed program should employ computer modeling of objective factors in order to identify the worst "30 percent" of the City's multifamily apartment buildings for inspection. Resolution 28046. Pursuant to Resolution 28046, DCLU developed the RHIP.

Unfortunately, the precise characteristics of the RHIP are not contained within a single legislative or administrative document; instead, the details of the RHIP must be gleaned from the various affidavits and declarations which are present in the record. In brief, the RHIP is a "predictive model" inspection program, whereby DCLU chooses to inspect buildings on the basis of certain objective factors associated with those buildings rather than on specific information of a violation of the housing codes. The "predictive model" which is the source of the RHIP's inspection decisions was developed by a private economics consultant. The consultant employed multiple regression analysis, a common statistical tool, to identify correlations between objective factors, like a building's age, and likelihood of serious code violations. Based on the data from the demonstration program, he ultimately identified three objective factors which had a statistically significant relationship to the likelihood of violations: building age, assessed value per unit, and number of code violations in the past 5 years. Using these three factors as predictors, the consultant selected the 30 percent of Seattle's multifamily apartment buildings with the highest likelihood of serious code violations.

DCLU implemented an inspection program with respect to the buildings on the 30 percent list through a system of owner notification, tenant consent, and, finally, search warrants. According to the official who manages the RHIP, apartment building owners are notified as a "matter of courtesy". Clerk's Papers, at 342. A letter is sent to each of

the affected tenants explaining the RHIP and requesting the tenant's consent to inspect. If the tenant refuses entry to the city's inspectors, a search warrant is sought ex parte. It is unclear from the record whether notice of the warrant proceeding is provided to the nonconsenting tenant. One tenant has indicated he received no notice, Clerk's Papers, at 1388, while another was informed a warrant would be sought, though not on what date or in what forum, Clerk's Papers, at 1173.

Resolution 28046 had directed DCLU to "design and propose" a proactive inspection program. While this language might imply the city council intended to review the RHIP before its implementation and pass an authorizing ordinance, no ordinance has been issued enacting the RHIP. However, the council has taken a number of actions indicating its support for DCLU and the program. As part of its budget ordinance for 1990, the council approved funds for the implementation of the RHIP. See ordinance 114800 (Dec. 1, 1989) and Clerk's Papers, at 250. The council also enacted an ordinance providing civil penalties for persons who interfered with RHIP inspections. Ordinance 116315 (Aug. 21, 1992). And finally, on July 13, 1992, the council issued a resolution, in which the mayor "concurred", recognizing that warrants might be necessary in order to carry out the RHIP. Resolution 28562 (July 13, 1992).

On April 2, 1991, prior to seeking any warrants, Seattle filed a class action in superior court, seeking a declaratory judgment that the RHIP was valid under both the Fourth Amendment and Const. art. 1, § 7. The complaint named a number of the appellants, including James and Ann. McCready, George Lott, and Marv Kaercher, as representatives of the class of "owners of multi-family rental housing". Clerk's Papers, at 1564. It also named a number of individuals, including Siobhan Stewart, Greg Marshall, and Kels Koch, as representatives of the class of "all tenants living in multi-family housing". Clerk's Papers, at 1564.

Seattle's attempts to carry its declaratory judgment complaint forward as a class action suit were rebuffed, however,

when the superior court denied certification of the owner and tenant classes. Seattle then continued its action with the former class representatives as defendants, moved for summary judgment on the constitutional issues, and presented the superior court with four specific warrant applications. The warrant applications applied to two apartments at 1737 Belmont Avenue, a building co-owned by Kaercher, an apartment at 1729 Boylston Avenue, and an apartment at 924 16th Avenue, a building owned by the McCreadys.

According to declarations attached to the warrant applications, Seattle had requested consent to inspect from each of the tenants occupying the apartments for which warrants were sought and consent had been refused in each case. Clerk's Papers, at 343-44, 353-55. The declarations also described the RHIP in some detail, including the demonstration program which provided the data on which the RHIP was based. Based on these warrant applications and other documents which were before the superior court as a consequence of the declaratory judgment action, the court issued the four requested search warrants on July 17, 1992. The court concluded that while the apartment building owners did have standing to challenge the RHIP, the program was constitutional under both the Fourth Amendment and Const. art. 1, § 7.

Each warrant directed representatives of DCLU to inspect the named apartments "during the daylight hours between 8:00 a.m. and 5:00 p.m. on a business day (Monday through Friday)." See, *e.g.*, Clerk's Papers, at 1270. The warrants further directed: "inspection shall be strictly limited to those places where [] violations of the Housing and Building Maintenance Code might reasonably be found." See, *e.g.*, Clerk's Papers, at 1270.

The defendants appealed the warrants to this court on July 20. Clerk's Papers, at 1251-52. In conjunction with that appeal, the defendants moved for an emergency stay of the warrants pending review. On July 23, the court commissioner granted the emergency stay with respect to only

three of the four warrants, since neither the owner nor the tenant at 1729 Boylston challenged the warrant with respect to that property. After a further determination by the commissioner that the case was properly appealable, this court accepted direct review.

## II

This case requires us to consider, construe, and apply the provision of our state fundamental law which provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Const. art. 1, § 7. It is by now commonplace to observe Const. art. 1, § 7 provides protections for the citizens of Washington which are qualitatively different from, and in some cases broader than, those provided by the Fourth Amendment. *See, e.g., Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988); *State v. Gunwall*, 106 Wn.2d 54, 65, 720 P.2d 808, 76 A.L.R.4th 517 (1986); *State v. Stroud*, 106 Wn.2d 144, 148, 720 P.2d 436 (1986).

The import of Const. art. 1, § 7 in any given context is not established merely by describing the differences between that provision and the Fourth or Fifth Amendments to the federal constitution. Rather, the focus is on whether the unique characteristics of the state constitutional provision and its prior interpretations actually compel a particular result. *See First Covenant Church v. Seattle*, 120 Wn.2d 203, 234-35, 840 P.2d 174 (1992) (Utter, J., concurring); *Stroud*, 106 Wn.2d at 158 (Durham, J., concurring in result). It was for this purpose, and for the purpose of assisting counsel in developing state constitutional arguments, that we originally established the familiar six nonexclusive *Gunwall* factors, *State v. Boland*, 115 Wn.2d 571, 575, 800 P.2d 1112 (1990), and then exercised our discretion to refuse to consider state constitutional claims "neither timely nor sufficiently argued by the parties", *State v. Wethered*, 110 Wn.2d 466, 472, 755 P.2d 797 (1988), when parties inadequately argued the critical *Gunwall* factors to the court. *See also Guimont v. Clarke*, 121 Wn.2d 586, 604, 854 P.2d 1 (1993);

*In re A,B,C,D,E*, 121 Wn.2d 80, 90 n.6, 847 P.2d 455 (1993); *State v. Reding*, 119 Wn.2d 685, 696, 835 P.2d 1019 (1992). In this case, the extensive briefing of the parties and amicus on the Const. art. 1, § 7 issue clearly meets the demands of *Gunwall* and *Wethered*.

The solution to this case is found in the unique characteristics of Const. art. 1, § 7, particularly its language and preexisting state case and statutory law.

Appellants and amicus present two arguments that the search warrants violate Const. art. 1, § 7. They first contend the RHIP was not properly promulgated by Seattle since DCLU's authority to develop the program was contained only in a "resolution" and not in an "ordinance", in violation of the Seattle City Charter. Second, they urge this court to reject the Fourth Amendment standards for administrative inspection established by the United States Supreme Court in *Camara v. Municipal Court*, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967), and *See v. Seattle*, 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967), and impose the traditional criminal law test of probable cause on administrative search warrants as a matter of state constitutional law.[1]

We appreciate the parties' desire to attain a definitive ruling from this court on the status of administrative search warrants in Washington, but we find that such a ruling is unnecessary to the resolution of this case. It is unnecessary due to an issue which presents itself to us with "disquieting obtrusiveness" upon our examination of the record. *Wiles v. Department of Labor & Indus.*, 34 Wn.2d 714, 719, 209 P.2d 462 (1949). That issue is the constitutional authority of a superior court to issue these search warrants at all in the absence of a specific authorizing statute or court rule. We deemed this issue to be of sufficient importance that we requested additional briefing from the parties pursuant to RAP 12.1(b).

---

[1]Amicus ACLU suggests an intermediate standard, individualized suspicion, which would operate somewhere between the laxer administrative standards of *Camara* and the stringent requirement of probable cause.

■ Ordinarily, the failure of the parties to raise an issue would preclude its examination at this stage. However, this court has frequently recognized it is not constrained by the issues as framed by the parties if the parties ignore a constitutional mandate, a statutory commandment, or an established precedent. *See Maynard Inv. Co. v. McCann*, 77 Wn.2d 616, 623, 465 P.2d 657 (1970) (court raising applicability of statute sua sponte); *Obert v. Environmental Research & Dev. Corp.*, 112 Wn.2d 323, 333-34, 771 P.2d 340 (1989) (same); *State v. Danforth*, 97 Wn.2d 255, 257, 643 P.2d 882 (1982) (same). This court has the inherent discretionary authority to reach issues not briefed by the parties if those issues are necessary for decision. *See Hanson v. Snohomish*, 121 Wn.2d 552, 557, 852 P.2d 295 (1993); *Alverado v. WPPSS*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004 (1989); *see also* RAP 12.1(b) (describing procedure by which courts may obtain additional briefing on issues not addressed by the parties).

■ The issue is one which implicates constitutional rights. *Cf. State v. McCullum*, 98 Wn.2d 484, 487, 656 P.2d 1064 (1983). To uphold the warrants in this proceeding without addressing the question of the magistrate's authority to issue those warrants would be to potentially countenance a serious governmental intrusion in contravention of the mandate of Const. art. 1, § 7. Ignoring the issue at this stage could lead to difficult implementation problems below. Regardless of our decision on the level of suspicion necessary to uphold a search warrant under Const. art. 1, § 7, the question of the issuing magistrate's authority would remain open and leave this area of the law in continuing uncertainty. In addition, the question is a purely legal one. Among the reasons courts often adduce for declining to address issues not properly briefed is the absence of a complete factual record. *See, e.g., John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 784-85, 819 P.2d 370 (1991). When the issue is entirely legal, that concern does not exist. The issue is also not one which was raised by this court sua sponte following argument. Instead, we requested the parties to

provide briefing and argument on the question pursuant to RAP 12.1(b). The parties have therefore had an opportunity to present their positions. For these reasons, we deem the question of the superior court's authority to issue these warrants, consistent with Const. art. 1, § 7, to be properly before us for decision.

## III

■ Const. art. 1, § 7 breaks down into two basic components: the disturbance of a person's "private affairs" or the invasion of his or her home, which triggers the protection of the section; and the requirement that "authority of law" justify the governmental disturbance or invasion. The language of Const. art. 1, § 7, strikingly divergent from the Fourth Amendment, appears to be derived from the United States Supreme Court's decision in *Boyd v. United States*, 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524 (1886). *See* Sanford E. Pitler, Comment, *The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy*, 61 Wash. L. Rev. 459, 521-22 (1986). There, the Court stated that the protective mantle of the constitution extended to "all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life." *Boyd*, 116 U.S. at 630. *See also In re Pacific Ry. Comm'n*, 32 F. 241, 251 (N.D. Cal. 1887). A disturbance of a person's private affairs generally occurs when the government intrudes upon "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from government trespass". *State v. Boland*, 115 Wn.2d 571, 577, 800 P.2d 1112 (1990) (quoting *State v. Myrick*, 102 Wn.2d 506, 510-11, 688 P.2d 151 (1984)). The assessment of whether a cognizable privacy interest exists under Const. art. 1, § 7 is thus not merely an inquiry into a person's subjective expectation of privacy but is rather an examination of whether the expectation is one which a citizen of this state should be entitled to hold. Many of the cases which comprise our Const. art. 1, § 7 jurisprudence have involved consideration of whether a particular governmental activity disturbed or intruded upon

legitimate entitlements of privacy under Washington law. *See, e.g., State v. Salinas*, 119 Wn.2d 192, 197-98, 829 Wn.2d 1068 (1992) (private conversations where one party consents to electronic recording of the conversation); *State v. Boland, supra* (garbage placed curbside for collection); *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) (information derived from a pen register); *State v. Myrick, supra* (aerial surveillance of property).

Seattle does not claim, nor could it, that a nonconsensual inspection of residential apartments is not a disturbance of "private affairs" under Const. art. 1, § 7. Moreover, it does not claim, nor could it, that the inspection of such apartments does not trigger Const. art. 1, § 7 because this challenge to the validity of the inspections is being brought by the owners of the apartment buildings rather than by the occupants of the apartments.[2] The only question under Const. art. 1, § 7 is therefore whether there exists adequate "authority of law" to justify the manifest disturbance of appellants' private affairs represented by the issuance and potential execution of these warrants.

We have in the past recognized that the authority of law for a particular governmental disturbance of a person's private affairs may be provided by a search warrant. *See Gunwall*, 106 Wn.2d at 68-69; *see also Tacoma v. Houston*, 27 Wn.2d 215, 221, 177 P.2d 886 (1947). Since Seattle has here obtained warrants for the search of appellants' apartment buildings from a superior court, this would appear to provide the authority of law necessary to justify Seattle's intrusion into appellants' private affairs.

---

[2]We note that under the Fourth Amendment, tenants in apartments affected by the RHIP could permit a warrantless inspection of common areas since they have "common authority" over those areas, even over objection by the apartment building owners. *See Illinois v. Rodriguez*, 497 U.S. 177, 181, 111 L. Ed. 2d 148, 110 S. Ct. 2793, 2797 (1990); *State v. Mathe*, 102 Wn.2d 537, 543, 688 P.2d 859 (1984); 68 Am. Jur. 2d *Searches and Seizures* § 92 (1993). Since Seattle does not press this argument, we have no occasion to decide whether a similar rule would be applicable under Const. art. 1, § 7. *See* George R. Nock, *Seizing Opportunity, Searching for Theory: Article I, Section 7*, 8 U. Puget Sound L. Rev. 331, 363 (1985) (arguing that a search with consent would not be a "disturbance" or "invasion" such as to trigger the authority of law requirement).

The warrant requirement, however, cannot be satisfied merely by the existence of a document which is labeled a warrant; instead, Const. art. 1, § 7 demands the existence of a *valid* warrant. *See State v. Myers*, 117 Wn.2d 332, 337, 815 P.2d 761 (1991) (describing a number of article 1, section 7 requirements for the validity of a warrant). If a warrant is not legally valid, it is in fact no warrant at all, and cannot serve as the authority of law for a governmental disturbance of an individual's private affairs.

■ One absolutely necessary component of a valid warrant is that it be issued by a magistrate with the legal authority to issue it. *See State v. Canady*, 116 Wn.2d 853, 854-57, 809 P.2d 203 (1991); *State v. Larson*, 29 Wn. App. 669, 672, 630 P.2d 485 (1981); see also Thomas M. Cooley, *Principles of Constitutional Law* 229 (3d ed. 1898) (recognizing this principle at a time roughly contemporaneous with the drafting of the Washington State Constitution). Where a warrant is issued by a magistrate without the authority to do so, it has no more validity than a warrant signed by a private citizen, and can no more serve as the authority of law necessary to satisfy the requirements of Const. art. 1, § 7. The question we address, therefore, is whether the Superior Court had the authority to issue these search warrants.

## IV

### A

■ We first note these warrants were issued on less than probable cause and therefore the usual statutes and court rules which govern search warrants in Washington are not applicable. RCW 10.79.015 authorizes search warrants on the basis of "reasonable cause" in four cases: to search for instruments of counterfeiting; to search for instruments of illegal gaming; to search for evidence of homicide or felony; and to search for instruments used to illegally obtain telephone service.[3] CrR 2.3 similarly authorizes the issuance of

---

[3]By statute, the Legislature has also authorized courts to issue search warrants in a variety of administrative contexts on probable cause. *See* RCW 17.10.160 (noxious weed laws); RCW 51.48.200 (certain tax laws); RCW 66.32.020 (liquor laws);

warrants on probable cause for the seizure of: evidence of crime; contraband or the fruits of crime; weapons and other instrumentalities of crime; and, persons to be arrested. Neither the statute nor the court rule is applicable here because these warrants were issued without probable cause.[4]

While recognizing the inapplicability of RCW 10.79.015 and CrR 2.3, Seattle contends superior courts are inherently authorized to issue search warrants on less than probable cause. We disagree and hold that a superior court is not authorized either by the common law or by the state constitution to issue search warrants on less than probable cause in the absence of a statute or court rule.

We have recognized that well-established principles of the common law may in some cases be sufficient to provide the authority of law required by Const. art. 1, § 7. In *State v. Ringer*, 100 Wn.2d 686, 691-94, 674 P.2d 1240 (1983), *overruled in part in State v. Stroud*, 106 Wn.2d 144, 720 P.2d 436 (1986), for example, we held that the common law tradition of search incident to arrest supplied the authority of law necessary to search a person lawfully arrested. *See also State v. Gunwall*, 106 Wn.2d 54, 68-69, 720 P.2d 808, 76 A.L.R.4th 517 (1986); *Stroud*, 106 Wn.2d at 164 (Durham, J., concurring in result); *State v. Llewellyn*, 119 Wash. 306,

---

RCW 69.41.060 (legend drugs); RCW 75.10.090 (unlawfully caught foodfish or shellfish); RCW 77.12.120 (contraband game).

[4]The warrants issued by the Superior Court indicate on their face that they were issued upon probable cause. See, *e.g.*, Clerk's Papers, at 1269. It is clear from the record, however, that the probable cause noted in the warrants was not probable cause as required by RCW 10.79.015 and CrR 2.3, but was instead "probable cause" as employed by the United States Supreme Court in *Camara v. Municipal Court*, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967) and *See v. Seattle*, 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967). In those cases, the Court held that for purposes of the Fourth Amendment, "probable cause" for an administrative search could be shown where "*reasonable legislative or administrative standards* for conducting an area inspection are satisfied with respect to a particular dwelling." (Italics ours.) *Camara*, 387 U.S. at 538. This court has recognized that the *Camara* "probable cause" standard is not equivalent to probable cause in its ordinary sense. *See Alverado v. WPPSS*, 111 Wn.2d 424, 435, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004 (1989); *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 56 L. Ed. 2d 305, 98 S. Ct. 1816 (1977) (under *Camara*, "[p]robable cause in the criminal law sense is not required"). In any event, Seattle does not contend that the warrants can be upheld on this ground, in part because the very purpose of the RHIP itself is to inspect without building-specific probable cause.

309-10, 205 P. 394 (1922). A well-established common law tradition of judicial issuance of search warrants could therefore perhaps provide the authority of law necessary for a superior court to issue these warrants.

■ There is, however, no general common law right to issue search warrants. *See* 68 Am. Jur. 2d *Searches and Seizures* § 126 (1993); 79 C.J.S. *Searches and Seizures* § 72 (1952). The generality expressed in the encyclopedia is confirmed by Washington's historical experience, where the authority for search warrants has always been derived from specific legislative authorizations or court rules. Even before Washington became a state, the legal authority for judges to issue search warrants was embodied in a statute. *See* Code of 1854, p. 101, § 2; Rem. Rev. Stat. § 2238. That ancient provision is still a part of our law, codified at RCW 10.79.015. Warrants to search for stolen goods were occasionally permitted at common law, but in Washington even that limited exception was subject to a statute. *See* Code of 1854, p. 100, § 1; Rem. Rev. Stat. § 2237 (codified at RCW 10.79.010, repealed by Laws of 1984, ch. 76, § 35). Cases from the earliest days of statehood indicate search warrants were issued pursuant to statutory authorization. *See, e.g., State v. Voelker*, 137 Wash. 156, 157, 242 P. 6 (1926); *Olson v. Haggerty*, 69 Wash. 48, 52, 124 P. 145 (1912); *State v. Moran*, 46 Wash. 596, 598, 90 P. 1044 (1907); *State ex rel. Romano v. Yakey*, 43 Wash. 15, 19-20, 85 P. 990 (1906). This practice explains in part why Const. art. 1, § 7 here merits independent construction. *See Gunwall*, 106 Wn.2d at 61-62 (discussing relevance of preexisting state law). Washington's longstanding tradition of limiting search warrants to carefully circumscribed statutory categories provides powerful support for the proposition that Const. art. 1, § 7 prohibits courts from issuing warrants without an authorizing statute or court rule.

The absence of a general common law authority for courts to issue search warrants was affirmed by this court in *State v. Fields*, 85 Wn.2d 126, 530 P.2d 284 (1975). There, the court held it had the authority, as head of the Washington

judicial system, to expand by court rule the categories of search warrants previously available under the statutes. 85 Wn.2d at 127. Necessarily implicit in that decision was the premise that Washington courts do not have an inherent common law authority to issue search warrants. If Washington courts do possess such an authority, the question of whether this court could vest them with that authority would be moot. There is no need to authorize by court rule that which is already authorized by common law. By deciding a court rule could expand upon the authority granted by the statute, the *Fields* court conclusively determined that no such authority existed in the absence of the statute or the rule.

Seattle attempts to distinguish *Fields* as a regulatory decision. In its view, the question in that case was not whether the Supreme Court could *authorize* the lower courts to issue warrants, but rather whether the Supreme Court had the authority to *regulate* the already existing authority to issue warrants. This reading of *Fields*, which is largely derived from dicta in Division One's decision in *State v. Davidson*, 26 Wn. App. 623, 627-28, 613 P.2d 564 (1980), *review dismissed*, 95 Wn.2d 1026 (1981) does not withstand scrutiny. The *Fields* court specifically framed its inquiry in terms of whether it had the authority to "expand the grounds for issuance of a search warrant beyond those legislatively authorized", 85 Wn.2d at 127, not whether it merely had the authority to limit or regulate those grounds. *Fields* therefore refutes the notion that search warrants are part of a superior court's common law authority.[5]

Decisions from other jurisdictions are in accord that the common law did not generally authorize courts to issue

---

[5]Examination of the dissent in *Fields* confirms our interpretation of that decision. Justice Rosellini did not contend superior courts had an inherent common law authority to issue search warrants and that therefore CrR 2.3 was invalid; to the contrary, he argued the State Supreme Court had no power to permit superior courts to issue search warrants. In his view, search warrants could *only* be authorized by statute. 85 Wn.2d at 131 (Rosellini, J., dissenting). Such a view of course runs contrary to the notion that a superior court has the independent common law authority to issue search warrants.

search warrants. *See, e.g., Meier v. Sulhoff,* 360 N.W.2d 722, 726 (Iowa 1985); *Grimmett v. State,* 251 Ark. 270A, 271-72, 476 S.W.2d 217, 220-21 (1972); *State v. Baker,* 251 S.C. 108, 109, 160 S.E.2d 556, 556 (1968); *United States v. Finazzo,* 583 F.2d 837 (6th Cir. 1978), *vacated on other grounds,* 441 U.S. 929 (1979).[6]

Seattle also argues the state constitution grants a superior court the authority to issue search warrants as part of the court's constitutional authority to issue "process". Seattle notes that Const. art. 4, § 6 provides superior courts with a broad grant of original jurisdiction; that in exercise of that jurisdiction superior courts are authorized by the constitution and by statute to issue "process"; and that search warrants are a form of "process". From this, Seattle concludes superior courts have the inherent constitutional authority to issue search warrants.

■■ Seattle's argument on the constitution fails in two respects. First, in this case Seattle's argument fails because the premise that this case falls within the original jurisdiction of the superior courts is faulty. None of the specific categories of original jurisdiction enumerated in Const. art. 4, § 6 apply here. *See* Const. art. 4, § 6.[7] The jurisdictional catchall category, where jurisdiction is vested in the superior court of "all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court", is also not applicable. The search warrants sought by Seattle are ultimately designed to enforce municipal ordinances, and the exclusive jurisdiction over such proceedings is vested in the municipal courts. *See* RCW 3.46.030; RCW 35.20.030; *Orwick v. Seattle,* 103 Wn.2d 249, 251, 692

---

[6]One case, *United States v. Torres,* 751 F.2d 875, 879 (7th Cir. 1984), has upheld a warrant relying upon *both* a court rule, Fed. R. Crim. P. 41, and the inherent authority of the federal courts. *Torres* notwithstanding, the weight of authority is in favor of the rule enunciated in the encyclopedias and followed in the Washington case law.

[7]Seattle's contention that the inspection of apartment buildings for purposes of enforcing the housing codes falls within "all cases at law which involve the title or possession of real property" is meritless.

P.2d 793 (1984). Once the Superior Court dismissed Seattle's declaratory judgment action and construed the complaint as an application for search warrants to enforce city ordinances, it was therefore divested of subject-matter jurisdiction and could not issue the warrants as "process" associated with exercise of its original jurisdiction.

More generally, Seattle's argument based on the constitution is unpersuasive for the same reason the argument based on the common law failed: if the state constitution independently authorized superior courts to issue search warrants, it would have been entirely unnecessary for this court in *Fields* to consider whether the superior court's authority to issue warrants could be expanded by court rule. Therefore, while it is true search warrants are a form of process, it does not follow that the issuance of search warrants is part of the inherent constitutional authority of the superior courts. Our state's historical practices and this court's decisions dictate that search warrants are a form of process which is to be governed by statute or court rule rather than by the discretion of a trial judge.[8]

This rule is salutary as well as constitutionally compelled. The search warrant is one of the most extraordinary means by which the State may exert its power, and one whose abuse may be the most grievously disruptive of the liberty of individuals. For example, when in possession of a warrant, government officials may use physical force to enter a dwelling or other premises if consensual entry is denied, *State v. Garcia-Hernandez*, 67 Wn. App. 492, 495, 837 P.2d 624 (1992), or if exigent circumstances are present, *State v. Young*, 76 Wn.2d 212, 217, 455 P.2d 595 (1969). As we noted in *State v. Myers*, 102 Wn.2d 548, 555, 689 P.2d 38

---

[8]Our recent decision in *State v. Thomas*, 121 Wn.2d 504, 851 P.2d 673 (1993) is not to the contrary. There, we considered only whether in the face of a purported conflict a statute or court rule concerning the execution of search warrants would prevail. In finding that the statute and court rule could be effectively harmonized, we affirmed our holding in *Fields* that search warrants were procedural and therefore appropriately governed by court rules. 121 Wn.2d at 511. At no point in *Thomas*, however, did we suggest that warrants would have been authorized in the *absence* of the statute or court rule.

(1984), "the officers possess the authority to intrude upon the privacy of the home regardless of the occupant's wishes and irrespective of his activity at the time of the intrusion." It is entirely appropriate that so powerful a tool of governmental authority be carefully circumscribed in its use through limitation to the subjects and procedures defined by a statute or court rule.

B

As noted above, RCW 10.79.015 and CrR 2.3 are not applicable because these warrants were issued on less than probable cause. Seattle does not argue otherwise; instead, Seattle contends the warrants were authorized by RCW 19.27.031, which incorporates several uniform housing codes, including the Uniform Building Code, the Uniform Mechanical Code, the Uniform Plumbing Code, and the Uniform Fire Code. Each of these codes grants inspectors a "right of entry" for enforcement purposes. From this "right of entry", Seattle draws the conclusion the Legislature must have intended to authorize superior courts to issue warrants in support of enforcement activities.

Seattle's interpretation of the uniform codes is unpersuasive because a right of entry, and even an authorization to seek a warrant to implement a right of entry, is not equivalent to a legislative authorization for a court to issue a warrant on less than probable cause. The distinction between a right of entry and the authorization to issue a search warrant can be simply demonstrated by comparing the uniform codes on which Seattle relies with a statute which *does* authorize a court to issue a warrant on less than probable cause. An example of a code which does authorize such a warrant is RCW 15.09.070, which governs inspections for horticultural pests and diseases, grants horticultural officials a right of entry onto private premises on less than probable cause, including for the purpose of general inspection. The statute allows those officials to enforce their right of entry by seeking search warrants and specifically allows: "[a] court may upon such application issue the

search warrant for the purpose requested".[9] It therefore countenances the possibility that a horticultural official may seek, and authorizes a court to issue, a general inspection search warrant on less than probable cause. The Legislature has crafted a number of statutory schemes similar to RCW 15.09.070, whereby courts are explicitly authorized to issue administrative search warrants in support of the enforcement of specific laws. *See* RCW 15.17.190 (horticultural grading laws); RCW 16.57.180 (livestock identification laws); RCW 17.24.021 (insects, pests, and plant diseases); RCW 19.94.260 (weights and measures laws); RCW 69.50.502 (pharmaceutical premises).

██ ██ None of the uniform code provisions relied upon by Seattle contain an authorization for a court to issue a search warrant upon less than probable cause. Instead, these code provisions allow inspectors who have been denied entry to a property for inspection to obtain, for example, "recourse to the remedies provided by law". Uniform Mechanical Code § 201(c).[10] The codes do not specify

---

[9]More fully, RCW 15.09.070 provides:

"Any authorized agent or employee of the county horticultural pest and disease board may enter upon any property for the purpose of administering this chapter [RCW 15.09] and any power exercisable pursuant thereto, including the taking of specimens, general inspection, and the performance of such acts as are necessary for controlling and preventing the spreading of horticultural pests and diseases. . . .

"Should any such employee or authorized agent of the county horticultural pest and disease board be denied access to such property where such access was sought to carry out the purpose and provisions of this chapter, the said board may apply to any court of competent jurisdiction for a search warrant authorizing access to such property for said purpose. *The court may upon such application issue the search warrant for the purpose requested.*" (Italics ours.)

[10]Section 201(c) of the Uniform Mechanical Code provides in full:

"When it is necessary to make an inspection to enforce the provisions of this code, or when the building official has reasonable cause to believe that there exists in a building or upon a premises a condition which is contrary to or in violation of this code which makes the building or premises unsafe, dangerous or hazardous, the building official may enter the building or premises at reasonable times to inspect or to perform the duties imposed by this code, provided that if such building or premises be occupied that credentials be presented to the occupant and entry requested. If such building or premises be unoccupied, the building official shall first make a reasonable effort to locate the owner or other person having charge or control of the building or premises and request entry. If entry is refused, the building official shall have recourse to the remedies provided by law to secure entry."

what those remedies are; instead, they direct courts to look elsewhere to determine what remedies are available. The absence of language like that contained in RCW 15.09.070 and the other statutes indicates a lack of legislative intent to authorize the issuance of warrants on less than probable cause. Moreover, if we were to interpret the right of entry included in the codes as also containing an implicit authorization for courts to issue search warrants, we would render the specific authorizing language in statutes like RCW 15.09.070 superfluous. This result, of course, runs directly contrary to the settled practice of construing statutes to avoid superfluous language. *See Cossel v. Skagit Cy.*, 119 Wn.2d 434, 437, 834 P.2d 609 (1992); *Clark v. Pacificorp*, 118 Wn.2d 167, 183, 822 P.2d 162 (1991). The uniform codes incorporated by RCW 19.27.031 therefore do not authorize the issuance of these warrants.[11]

Seattle has not shown there is a statute or court rule which authorizes a superior court to issue these search warrants. The warrants are thus invalid, and any intrusion into appellants' apartment buildings or disturbances of their private affairs on the basis of the warrants is without authority of law. Under Const. art. 1, § 7, the warrants must be quashed.

---

[11]Even if the code itself provided for a warrant, this does not itself imply that a statute is categorically sufficient to provide the authority of law necessary to satisfy Const. art. 1, § 7. We rejected such a position in *State v. Curran*, 116 Wn.2d 174, 184-85, 804 P.2d 558 (1991), where we considered the Const. art. 1, § 7 validity of nonconsensual blood testing of suspected drunk drivers. We held the blood testing should be evaluated as a disturbance of the defendant's private affairs under a standard of reasonableness, even though the blood testing was specifically authorized by statute. 116 Wn.2d at 184-85. While we ultimately held that the statute survived constitutional scrutiny, we recognized the statute might have been invalid under Const. art. 1, § 7 had it not been reasonable. In this case, we examine the uniform codes because, prior to examining whether a particular statute may satisfy Const. art. 1, § 7, it is necessary to determine whether an applicable statute exists. Since we conclude that there is no such statute, we do not consider whether a specific authorizing statute would otherwise pass constitutional muster.

Seattle and various amici urge upon us the argument that areawide inspections are imperative to protect the interests of apartment dwellers. Amicus Washington State Fire Chiefs Association points out, for example, that apartment buildings account for a disproportionate percentage of fires and that housing code violations are a frequent cause of such fires. We are sensitive to these concerns, but in the final analysis our decision must be governed by the enduring mandate of our state fundamental law and not by the fluctuating demands of present expediency. It may well be true, as Seattle and amici argue, that areawide preventive inspections are the most effective means of enforcing the housing codes, and that such inspection programs will be facilitated by the availability of search warrants to overcome the resistance of those tenants who refuse to let their apartments be inspected. Yet it is often when government is most eagerly pursuing what it perceives to be the public interest that it is most likely to sidestep constitutional safeguards or to denigrate constitutional liberties. For precisely such reasons, our constitution wisely counsels us:

> A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government.

Const. art. 1, § 32. Const. art. 1, § 7 commands that no individual's private affairs may be disturbed without authority of law. We are unable to accept the proposition that such authority of law may be provided by a warrant issued by a magistrate who is himself not authorized to issue that warrant. We therefore cannot permit these warrants to be executed, regardless of Seattle's pressing (and undoubtedly laudable) desire to see its housing codes enforced.

Given our resolution of this portion of the proceedings, it is unnecessary to address appellants' additional arguments that Const. art. 1, § 7 generally prohibits the issuance of search warrants on less than probable cause. It is also unnecessary to address appellants' arguments that this court should ignore the United States Supreme Court's pronouncements in *Camara v. Municipal Court*, 387 U.S.

523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967) and *See v: Seattle*, 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967) as dicta, and hold the warrants violate the Fourth Amendment because they were not issued upon traditional standards of probable cause. *See Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 209, 848 P.2d 1258 (1993) (where state constitutional provision is dispositive, it is unnecessary to consider other constitutional claims).[12]

## V

Finally, appellants request attorney's fees under 42 U.S.C. § 1988. This statute provides:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 . . . , or title VI of the Civil Rights Act of 1964 . . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988. A civil rights plaintiff "prevails" for purposes of § 1988 when "actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 121 L. Ed. 2d 494, 113 S. Ct. 566, 573 (1992).

 "Under the plain language and legislative history of § 1988, however, only a court in an action to enforce one of the civil rights laws listed in § 1988 may award attorney's fees." *North Carolina Dep't of Transp. v. Crest St. Comm'ty Coun.*, 479 U.S. 6, 15, 93 L. Ed. 2d 188, 107 S. Ct. 336 (1986); *see also Venuti v. Riordan*, 702 F.2d 6, 12 (1st Cir.

---

[12]We do note, however, most courts have treated the *Camara* "dicta" as governing Fourth Amendment law. *See, e.g., Michigan v. Tyler*, 436 U.S. 499, 507, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978); *Pennsylvania Steel Foundry & Mach. Co. v. Secretary of Labor*, 831 F.2d 1211, 1214-15 (3d Cir. 1987); *In re Establishment Inspection of Gilbert & Bennett Mfg. Co.*, 589 F.2d 1335, 1338 (7th Cir.), *cert. denied sub nom. Chromalloy Am. Corp. v. Marshall*, 444 U.S. 884 (1979). This court has described the *Camara* standards as "well established". *State v. Bell*, 108 Wn.2d 193, 208, 737 P.2d 254 (1987). *See also Alverado v. WPPSS*, 111 Wn.2d 424, 435, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004 (1989); *Washington Massage Found. v. Nelson*, 87 Wn.2d 948, 558 P.2d 231 (1976); *Seattle v. Leach*, 29 Wn. App. 81, 84, 627 P.2d 159 (1981); *Seattle v. See*, 26 Wn. App. 891, 894-96, 614 P.2d 254, *review denied*, 94 Wn.2d 1022 (1980).

1983); *Perry v. Hammond*, 548 F. Supp. 627, 629-30 (E.D. La. 1982). Appellants do not explain how this proceeding, which is solely an appeal under RAP 2.2 to quash the warrants issued by the superior court,[13] is an action to enforce any of the civil rights statutes listed in § 1988. The cases cited by appellants in support of their request for fees are inapposite, since in each of those cases the civil rights plaintiffs sought money damages, declaratory or injunctive relief under 42 U.S.C. § 1983. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 785, 103 L. Ed. 2d 866, 109 S. Ct. 1486 (1989); *Wallace v. King*, 650 F.2d 529, 530 (4th Cir. 1981); *Finney v. Hutto*, 548 F.2d 740, 742 (8th Cir. 1977). Neither § 1983 nor any of the other civil rights statutes is at issue here. Since this appeal is therefore not an action or proceeding to enforce one of the statutes listed in § 1988, this court has no authority under that provision to award attorney's fees.[14] Appellants' request for attorney's fees is accordingly denied.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

Reconsideration denied April 29, 1994.

---

[13]The superior court order from which appeal was taken in this case denied the City's motions for declaratory relief and summary judgment, denied appellants' motion to dismiss the warrant applications, and granted the issuance of the four requested search warrants. See Clerk's Papers, at 1282. Since the City has not cross-appealed the dismissal of its motion for declaratory relief, the only issue which is properly before this court is with regard to the warrants.

[14]The record indicates that subsequent to their appeal of the warrants, appellants were permitted to file an amended answer including a counterclaim under 42 U.S.C. § 1983. See Clerk's Papers, at 1284-85. In the counterclaim, appellants are seeking compensatory and punitive damages and injunctive relief. See Clerk's Papers, at 1292-96. If appellants prevail on the merits in that action, a fee award under § 1988 may well be warranted.